KELLY, HOW, THOMPSON COMPANY v. THE MINNESOTA
LOAN & TRUST COMPANY AND ANOTHER.[1]

June 13, 1924.

No. 23,988.

**Division of loss charged to joint adventure a fraud on partner.**
1.  R and K, during the fall and winter of 1919-1920 were engaged in buying and selling potatoes on a joint account. R was in exclusive charge of the selling. In October, 1919, R made several contracts for the delivery of potatoes in March, 1920. On their face, they were the contracts of R. He made no contemporaneous record, in his accounts or otherwise, indicating that they were for the joint account with K. K was not so advised until the end of the season. Cash payments received on the contracts were not credited to the joint account. When the contracts were filled in March, 1920, joint account potatoes were applied to them when the market was far above the contract price, and the joint account was attempted by R to be charged with the resulting loss. *Held* that such action on the part of R was a fraud upon K.

**Good faith of partners applies to joint adventure.**
2.  The standards of good faith and open dealing applicable to partners govern such a joint adventure.

**Joint account to be credited with property diverted.**
3.  The wrongful diversion of the joint account potatoes was in the nature of a conversion, and the joint account accordingly should have credit for the value of the diverted potatoes at the time and place of diversion.

Action in the district court for Hennepin county for an accounting. By order of court Kelly, How, Thompson Company, assignee, was substituted as plaintiff in place of O. F. Kelting, assignor and original plaintiff. After the death of D. E. Ryan, the original defendant, the executors under his last will and testament were substituted by order of court as defendants. The case was tried before Waite, J., who made findings and ordered judgment in favor

[1]Reported in 199 N. W. 233.

of plaintiff for $5,787.08. From an order denying their motion for amended findings or a new trial, defendants appealed. Affirmed.

*Edward P. Kelly*, for appellants.

*George A. Lewis*, for respondent.

STONE, J.

This is an action for an accounting wherein the decision below was for plaintiff. Defendants moved for amended findings or a new trial and appeal from the denial of a new trial. The plaintiff, as his assignee, has been substituted for O. F. Kelting, the original plaintiff. Since the action was commenced, D. E. Ryan, the original defendant, has passed away and his executors have been substituted.

In 1919 and 1920, Mr. Ryan was doing a produce brokerage business in Minneapolis. Mr. Kelting resided at Downer, Minnesota, where he operated a potato warehouse and bought direct from the producer. On August 13, 1919, Kelting and Ryan entered into a written contract whereby as a joint adventure, they agreed "to handle potatoes during the season of 1919-1920." Kelting was to do the buying at Downer and have full charge of the enterprise at that end. Ryan was to "have charge of selling and disposing of all said potatoes purchased at Downer," which were to be "bought at prices agreed upon by both parties." Ryan was to finance the business and "stand all expenses incurred in selling and disposing of said potatoes."

There is no question but that Kelting, on his part, strictly performed the contract. From September, 1919, to March, 1920, inclusive, he bought at Downer and shipped on his joint account with Ryan 79 carloads of potatoes. This comprised but a small amount of Ryan's business, who during the same season, handled over 2,000 cars. It was a most unusual season for the potato market. From a quiet and unexciting level at the beginning of the season, prices rose in a most unexpected and unexplainable fashion until in March, potatoes had sold for over $6 per hundred.

At the end of the season there was what, on the part of Ryan, purported to be a final accounting. It disclosed a profit of $5,099.05, Kelting's one-half of which was paid. He was not satisfied, Ryan's

accounts of the joint enterprise were gone over and this suit resulted. The decision below awarded Kelting an additional sum of $5,787.08. That result is right if the future delivery contracts about to be discussed were not made from the joint account. The dceision under review held that they were not.

Four future delivery contracts, for more than 10 carloads, were made in October, 1919, between Ryan personally and certain customers of his in other markets. They called for March, 1920, delivery. The prices ranged from $3 to $3.70 per hundred. Because of the unprecedented rise in the market, the potatoes, when finally delivered under these orders, represented a very considerable loss to the seller in comparison with what they would have brought on the open market at that time. Several cars of Kelting's potatoes, shipped on the joint account, were applied by Ryan on these contracts. The actual proceeds (as distinguished from the then value of the potatoes), were credited by Ryan to the joint account, which would have been entirely proper if the contracts under which they were delivered had been those of Ryan and Kelting instead of the individual affairs of Ryan.

On behalf of the plaintiff it was claimed, and the trial court sustained the claim, that the joint account should not have been charged with any of the future delivery contracts, and that it should have credit instead for the much higher prices of the Downer potatoes, used to fill them, that would have been realized had they been sold on the open market in the usual way.

Our review of the evidence discloses no avenue of escape from the view of the learned trial judge. In fact, his characterization as "constructive fraud" of the attempt to unload the loss under the future delivery contracts upon the joint account with Kelting is very mild.

There is not in the record proof of a single circumstance indicating that the contracts were made for the joint account, instead of for Ryan's individual benefit, except the assertion of the witness, Callender, to that effect. He seems to have been in general charge of the office end of the Ryan business. The circumstances which persuaded the trial court to disregard Callender's ex post facto

allocations to the joint account consisted, first, of the fact that Kelting never knew of the existence of Ryan's March delivery contracts or any of them, and was not aware that any of his potatoes had been applied to them, until the first attempt at a final accounting. That was after the shipping season was over.

In other words, notwithstanding the duty of good faith and frank disclosure resting upon the parties, Callender, acting for Ryan, very quietly unloaded on the joint account several very unprofitable contracts, concealing that operation from Kelting until concealment was no longer possible.

The next and most persuasive circumstance, is that on several of these contracts cash deposits were accepted at the time they were made in the fall of 1919. These deposits aggregated $1,100. They were received by Ryan and on his books credited to the payers and charged to cash. There was not an entry or notation anywhere in Ryan's office, or elsewhere, indicating that he or Callender, or anyone else, considered these contracts or any of them as having anything to do with the Kelting account.

If that had been the fact, the obviously proper and honest thing would have been to charge his own account and credit the joint account with the deposits so received. The absence of such an entry, or any contemporaneous record, indicating an intention to apply these contracts on the joint account, is a negative but cogent circumstance, very persuasive of the conclusion that no such intention ever existed until after the loss occurred.

We cannot indulge the presumption that had the market gone the other way, and these futures shown a profit, the joint account would have gotten the benefit. Anyway, Kelting would not have compelled that result for all the evidence, whatever the fact may have been, was in the minds of Ryan and Callender. That sort of treatment of one's associate in a joint enterprise is not permissible. It is too far from "the utmost good faith and openness of dealing" which the law requires. Hodge v. Twitchell, 33 Minn. 389, 23 N. W. 547. Compare Newell v. Cochran, 41 Minn. 374, 43 N. W. 84. The participants in such a transaction are under the same obliga-

tions to each other as partners. Church v. Odell, 100 Minn. 98, 110 N. W. 346.

It would have been entirely proper for Ryan to have accepted for the joint account orders for future delivery. It might have been good business. But, if it had been done, the elementary rules of business ethics required prompt and full disclosure to the other interested party. The same rules suggest and good business practice requires, in such a case, the making of a contemporaneous and unequivocal record, in accounting or otherwise of the true nature of the transaction.

It is not permitted to the party in control of the situation to take and maintain a position where he can avoid half the loss, if any, but absorb all of the profit, if the deal turns out that way. That is apparently what was attempted here. If Mr. Ryan was acting in good faith, he permitted the transaction to be handled in a manner in every possible way indicating bad faith. If there was actual bad faith, which was not found below, it would be hard to imagine more persuasive or more to be expected proof of it than the manner in which, after they were closed, it was attempted to charge to the joint account the several future delivery contracts referred to. To put the stamp of business or judicial approval on that course, would be jesting with fair dealing and the principles whereby judgment determines the significance of human contract.

Approving, as we do, the conclusion reached below that the future sales contracts were not made for the joint account, there is no occasion for going further into the facts. We are not overlooking the contention that, inasmuch as the joint account was relieved of the future delivery contracts, the Downer potatoes applied thereon should be credited at prices other and lower than those adopted below. The trial court, in readjusting the account, allowed credit for the Downer potatoes, applied on the March delivery orders, as of the dates of their shipment and at the prices then prevailing. There is no suggestion that those prices could not have been realized had the potatoes been sold on the open market as shipped. The argument that those values should be discarded and that others, prevailing earlier in the season at dates when it is supposed

that the several carloads in question might have been but were not shipped, is untenable. The case, in this aspect, is not unlike one for conversion. The values taken were those of the potatoes at the time and place of their wrongful diversion from the joint account, an obviously proper measure of damage.

Another question argued by counsel, concerning an item of "three miscellaneous cars," we pass without special discussion because it is disposed of adversely to appellant by our holding as to the contracts for future delivery.

Order affirmed.